# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

JOSEPHINE MILLER,
    *Plaintiff*,

    v.

BRIDGEPORT POLICE DEPARTMENT, *et al.*,
    *Defendants*.

No. 3:14-cv-00689 (JAM)

## RULING GRANTING MOTION TO DISMISS

Plaintiff is an African-American attorney who alleges in principal part that defendants discriminated against her on the basis of her race. She claims that she wished to furnish legal representation to certain employees of the City of Bridgeport but that defendants—who include Bridgeport's city attorney and other staff attorneys—discriminated against her when they declined to pay for her representation services. Defendants have moved to dismiss, principally on the ground that the complaint is time-barred by the statute of limitations and that it otherwise fails to allege facts that plausibly support plaintiff's claim of discrimination. I agree, and therefore I will dismiss plaintiff's federal discrimination claims with prejudice, and dismiss her state law claims without prejudice to re-filing of her state law claims in state court.

### BACKGROUND

The following facts are drawn from plaintiff's second amended complaint. Doc. #31. Plaintiff is an African-American female who has been a licensed attorney for 35 years. The defendants named in the caption of plaintiff's complaint are the Bridgeport Police Department as

well as the City Attorney for the City of Bridgeport (Mark Anastasi) and two attorneys with the Bridgeport Office of the City Attorney (Russell Liskov and Arthur Laske).[1]

The complaint focuses on plaintiff's effort to furnish legal representation to two city employees—Gilberto Valentin and Albert Karpus—who were named as defendants in civil lawsuits in connection with their police job responsibilities. Connecticut state law requires that for certain kinds of legal claims brought against municipal employees, the municipality must "protect and save harmless" such employees from lawsuits including for legal fees and costs. *See* Conn. Gen. Stat. § 7-101a.[2] As is the practice in many municipalities, lawyers from the Bridgeport Office of the City Attorney often represent city officers or employees who are subject to suit unless it appears that there may be a conflict of interest between the employee and the City, in which case the Office of the City Attorney selects counsel from an outside law firm to represent the officer or employee. *See* Bridgeport City Charter, Ch. 7, Sec. 4.[3]

---

[1] Although the complaint's caption identifies just these three defendants, the body of the complaint quite confusingly refers to other entities—such as the City of Bridgeport and the Office of the City Attorney—as "defendants" despite the fact that they are *not* named as defendants in the caption. Defendants' motion to dismiss persuasively argues why the Bridgeport Police Department is not a proper defendant at all and why plaintiff should have named the City of Bridgeport as a defendant for the allegations she makes. Because plaintiff's complaint is subject to dismissal on other grounds, I need not resolve this issue.

[2] Conn. Gen. Stat. § 7–101a states, in relevant part: "(a) Each municipality shall protect and save harmless any municipal officer . . . or any municipal employee of such municipality from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgment by reason of alleged negligence, or for alleged infringement of any person's civil rights, on the part of such officer or such employee while acting in discharge of his duties."

[3] Section 4 of Chapter 7 of the Bridgeport City Charter codifies this procedure at least with respect to suits against "officers" and other municipal entities: "The Law Department shall be the legal counsel to every board, commission, department and officer of the city and shall represent the city in the prosecution and defense of all civil actions. When the interests of the city require, the city attorney may engage any necessary outside counsel, experts or assistants; provided that funds are available for such purpose. If a conflict arises between different boards, commissions, departments, officers, or between any of them and city council, the city attorney shall assign different attorneys within the Law Department to represent each said governmental body in conflict and said attorneys shall represent them in the manner required by all rules of professional conduct of attorneys unless the city attorney determines that the only manner in which a conflict can be avoided is by retention of private legal counsel for one or more of such governmental bodies, in which case the city attorney shall select said counsel. Except as otherwise expressly provided by law, no board, commission, officer or department of city shall retain legal counsel to represent it in any matter without the approval of the city attorney." Notwithstanding the fact that this Charter provision does not expressly reference "employees" as distinct from "officers," there is no reason to suppose that the City Attorney should not have equivalent discretionary authority with respect to employees.

According to the complaint, a state court lawsuit was filed in December 2009 against Gilberto Valentin of the City's police department. In January 2010, Valentin advised the City that he wished for plaintiff to represent him to defend against this lawsuit. According to the complaint, Valentin "contracted with Plaintiff to perform legal services for him in the state court action," and "Valentin's contract with Attorney Miller to perform legal services on his behalf in the state court action created a right of indemnity for said legal expenses to be paid by Defendant Police Department and [the] Office of the City Attorney." Doc. #31 at 4 (¶¶ 15 & 16) (citing Conn. Gen. Stat. § 7-101a).

Rather than acknowledging plaintiff's representation of Valentin, the City attorney's office at first purported to represent Valentin and then later in 2010 tried to arrange for Valentin to be represented by a white male attorney, and did so without Valentin's consent. Plaintiff subsequently submitted invoices in August 2010 and December 2013 to the City for the services that she had performed on Valentin's behalf, but the City has refused to pay them. *See id.* at 3-7 (¶¶ 6-45).

The complaint further recounts a similar episode with a second police officer client, Albert Karpus, who—like Valentin—was also in need of representation because he had been named as a defendant in a civil lawsuit. In September 2010, plaintiff filed a notice of appearance on Karpus's behalf but the City again refused to pay for plaintiff's services. *See id.* at 10-11 (¶¶ 65-69).

Plaintiff alleges that the Office of the City Attorney wrote her letters in October 2010 contending that she had a conflict of interest with respect to representing city employees because of the fact that she also represented other clients in litigation *against* the City of Bridgeport as a defendant. *Id.* at 11 (¶ 69). Thus, as the complaint alleges, "[o]n October 29, 2010, Plaintiff

3

received a letter threatening some action against her and once again contending that she may not represent any city employees because of 'legal and ethical' concerns." *Id.* at 11 (¶ 71). The letter advised plaintiff that she was free to be retained by and paid by a city employee to represent the employee's personal interests, but "under no circumstances should you assume, or act upon a belief, that you have received any authorization to perform any legal services on behalf of any city employee pursuant to an obligation by the City of Bridgeport to provide a defense or indemnification under C.G.S. Sec. 7-465 et seq. and/or 7-101a et seq." Doc. #41-2 at 1. It further stated that "your filing of an appearance on behalf [of] an individual does not, and will not, entitle you to payment from this office for any legal services rendered by your office on behalf of such individual." *Ibid.*[4]

According to the complaint, plaintiff responded to this letter by filing a grievance complaint against the Office of the City Attorney with Connecticut's Statewide Grievance Committee alleging an ongoing interference by the Office with plaintiff's representation of her clients. Doc. #31 at 11 (¶ 71). But, as the complaint itself recounts, a grievance panel dismissed her claim and concluded instead "that Plaintiff had engaged in illegal actions." *Id.* at 11 (¶ 73).[5]

Apart from these allegations with respect to her failure to be paid by the City for her representation of clients Valentin and Karpus, the complaint includes additional allegations of

---

[4] The letter is an attachment to defendants' motion to dismiss, and—because it is expressly referenced by plaintiff in her complaint—it is of course properly considered for purposes of a Rule 12(b)(6) motion to dismiss. *See, e.g.*, *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015). The same holds true for other extrinsic documents quoted in this ruling.

[5] Defendants have attached copies to their motion papers of plaintiff's grievance complaint and the written response by the grievance panel. Notably (and unlike this federal court complaint), plaintiff's lengthy grievance complaint did not allege any racial discrimination by the Office of the City Attorney. Doc. #41-3 at 1-4. Instead, plaintiff solely disputed the authority of the Office of the City Attorney to decide which outside counsel should represent city employees in litigation when the Office of the City Attorney has a conflict of interest that prevents the Office from representing the employee in the first instance. The grievance panel rejected plaintiff's argument on the ground that Bridgeport's city charter gives authority to the Office of the City Attorney to choose counsel for city employees, that the city attorney had "warned [plaintiff] by letter that she was not authorized to represent City employees or interject herself in City litigation or seek compensation from the City," and that plaintiff's contrary "actions were illegal." Doc. #41-4 at 2.

4

discriminatory wrongdoing by one or more of the defendants (and sometimes by non-defendants such as the grievance panel who ruled against her). For example, plaintiff alleges about midway through the complaint that defendants "maintained a policy, practice, and custom of engaging only majority white law firms to perform legal services pursuant to C.G.S. § 7-101a," and that they "retained no African-American lawyers similarly situated to Plaintiff to perform legal services pursuant C.G.S. § 7-101a." Doc. # 31 at 7-8 (¶¶ 45 & 46).

Plaintiff further alleges that she spoke in October 2013 to Errol Skyers, an Assistant City Attorney, who told her that her name was on a "no pay" list maintained by the City Attorney's office and that "certain attorneys who have multiple cases against the City of Bridgeport would not be permitted to have their cases settled under any circumstances." *Id.* at 8 (¶ 51). In similar fashion, the complaint alleges that plaintiff was told by an unnamed client in October 2013 that defendant Russell Liskov of the Office of the City Attorney had recommended to the client that the client not use plaintiff as an attorney for a federal lawsuit that the client was planning to file against the City and that plaintiff use another attorney, Thomas Bucci. *Id.* at 8-9 (¶¶ 52-56). Liskov told the client that there were some attorneys with whom the City did not settle cases and that plaintiff was one of those attorneys, but that Bucci was someone with whom the City did reach settlements. *Id.* at 9 (¶¶ 56-57).

The complaint alleges additional wrongdoing by Deputy City Attorney Arthur Laske in March 2015. Laske allegedly falsely claimed in a legal proceeding before the Connecticut Commission on Human Rights and Opportunities that plaintiff had been "referred to the Statewide Grievance Counsel for disciplinary action and temporarily **suspended from the practice of law**." *Id.* at 12 (¶ 79) (emphasis in original). Laske allegedly told the same thing to certain of plaintiff's clients. *Id.* at 12 (¶ 80).

Paragraph 84 of the complaint summarizes plaintiff's claims of wrongdoing by the defendants as follows:

> The Defendant municipal agencies, municipal officers, municipal attorneys and outside attorneys committed overt acts in further of such conspiracy, including but not limited to the following acts: Defendant municipal agencies refused to compensate Plaintiff for valuable legal services performed by her on behalf of city employees while compensating Caucasian attorneys for the same or similar legal services; Defendant municipal officers and attorneys placed Plaintiff on a 'no pay' list in order to discourage clients from utilizing Plaintiff; Defendant municipal officers and attorneys tortuously [sic] interfered with Plaintiff's business relationship with her clients in order to discourage them from utilizing her services; Defendant municipal attorneys encouraged Plaintiff's clients to utilize a Caucasian attorney with whom they would prefer to deal while discouraging said clients from utilizing Plaintiff; Defendant municipal officers and attorneys instructed an outside attorney to file an appearance and represent Plaintiff's client when they knew that he was being represented by Plaintiff; Defendants maintained a policy, practice and custom of not retaining similarly situated African-American attorneys to perform legal services pursuant to C.G.S. § 7-101a.

*Id.* at 13 (¶ 84).

Counts One and Two of the complaint allege federal claims under 42 U.S.C. §§ 1981 and 1983 of race discrimination in the making and enforcing of contracts.[6] Counts Three, Four, and Five allege state law claims of quantum meruit, unjust enrichment, and tortious interference with contract. Count Six alleges a claim of federal civil rights conspiracy pursuant to 42 U.S.C. § 1985(3),[7] and Count Seven alleges an Equal Protection claim against defendant Mark Anastasi.[8]

---

[6] These two counts in their headings name the City of Bridgeport and the Office of the City Attorney as purported defendants despite the fact that neither one of these two entities is actually named as a defendant in the caption of the complaint. Equally oddly, plaintiff devotes wholly separate counts (Counts One and Two) to identifying defendant Anastasi as a defendant in both his official and individual capacity; by contrast, Count Seven alleges a claim in a single count against Anastasi in both his individual and official capacity.

[7] Count Six of the complaint includes what even plaintiff concedes to be "bizarre" factual allegations (Doc. #49 at 15) that some unnamed person ("Jane Doe") approached plaintiff to offer her a $1 million bribe to cease practicing law and that plaintiff accepted $200,000 from this mystery individual but then gave the $200,000 back to her, except for $20,000 that plaintiff decided to tithe to her church. Plaintiff speculates—without any allegations in the complaint or additional information in response to my questioning at oral argument—that "Jane Doe" and the purported $1 million bribe has something to do with the City of Bridgeport defendants in this case. Because there is nothing to connect the $1 million "bribe" allegation to the defendants in this case and because it is utterly fantastical to believe that these municipal defendants would have a $1 million at their disposal to buy off the plaintiff (much less a reason to spend this kind of money to stop plaintiff from practicing law), I place no weight on these allegations in the complaint.

**DISCUSSION**

The principles governing this Court's consideration of a Rule 12(b)(6) motion are well established. First, the Court must accept as true all factual matter alleged in a complaint and draw all reasonable inferences in a plaintiff's favor. *See Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013). But "'[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (citing *Twombly*, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations and quotation marks omitted). Accordingly, unless a plaintiff's well-pleaded allegations have "nudged [the] claims across the line from conceivable to plausible, [then the] complaint must be dismissed." *Id.* at 570; *Iqbal*, 556 U.S. at 679 (same).

Although plaintiff is a *pro se* litigant, she is in fact a highly experienced attorney and a frequent and sometimes successful litigant on behalf of clients in the District of Connecticut.[9]

---

[8] Although the complaint does not specify a statutory cause of action for her claim for a violation of Equal Protection, I will assume that because the Equal Protection claim is brought against a state actor that the claim is otherwise subject to the requirements for a federal civil rights action against a state actor pursuant to 42 U.S.C. § 1983. *See, e.g.*, *Davis v. Passman*, 442 U.S. 228, 238 & n.16 (1979).

[9] *See, e.g., Gaul v. City of New Haven*, 2016 WL 2758251, at *2 (D. Conn. 2016) (Meyer, J.) (awarding attorney's fees following jury verdict for plaintiff's client and noting in part that "[i]t was evident as well to me at trial that plaintiff's counsel is a highly capable and skilled trial attorney," that "counsel was thoroughly prepared, organized, and adept at all stages of argument and examination of witnesses," and "notwithstanding that the Court has been previously critical of the conduct of plaintiff's counsel in a different case, no such concern appeared in counsel conduct of the litigation in this case") (citation omitted).

Accordingly, there is no reason here to treat the allegations of her complaint by reference to the more generous pleadings standards that are afforded to unlearned *pro se* litigants. *See, e.g.*, *Harbulak v. Suffolk County*, 654 F.2d 194, 198 (2d Cir. 1981) (Oakes, J.).

### *Statute of Limitations*

Defendants move to dismiss on the ground that plaintiff's federal law claims are time-barred by the statute of limitations. All of plaintiff's federal civil rights claims are subject to Connecticut's 3-year statute of limitations for personal injury actions. *See Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 131 (2d Cir. 1996) (§ 1981 claims); *Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1994) (§ 1983 claims); *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994) (§ 1985 claims). The statute of limitations "accrues" (*i.e.*, begins to run) on the date when "the plaintiff knows or has reason to know of the injury which is the basis of his [or her] action." *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002); *see also Wallace v. Kato*, 549 U.S. 384, 388, 391 (2007) ("it is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief," such that "the tort cause of action accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages," even if "the full extent of the injury is not then known or predictable."); *Fahs Const. Group, Inc. v. Gray*, 725 F.3d 289, 292 (2d Cir. 2013) (*per curiam*) (cause of action accrues for Equal Protection claim under 42 U.S.C. § 1983 "when the plaintiff knew or should have known of the disparate treatment").

Here, as to plaintiff's claims involving the City's failure to contract with or compensate her for the legal services that she wished to furnish on behalf of Bridgeport city employees, the statute of limitations began to run at the latest on October 29, 2010—the date when plaintiff was definitively advised in writing by the City that it had not and would not authorize or compensate

8

her for the representation of city employees. As of October 29, 2010, plaintiff was undoubtedly aware of the injury that she now complains about. Because the letter advised plaintiff in no uncertain terms that the City would not authorize or pay for her services, there is no merit to plaintiff's claim that she was "not on actual notice until such time [in December 2013] as the city actually refused to make payment after presentation of legal services invoices" for her representation of Valentin. Doc. #49 at 6.

Accordingly, in light of letter of October 29, 2010, the statute of limitations on her claims arising from the City's alleged failure to contract with or otherwise pay her for her services expired three years later on October 29, 2013. Because plaintiff did not file this lawsuit until May 14, 2014, her federal law claims are plainly time barred because they are well outside the 3-year limitations period. *See, e.g.*, *Andrews v. Fremantlemedia, N.A., Inc.*, 613 Fed. Appx. 67, 68 (2d Cir. 2015) (affirming dismissal of claims under §§ 1981 and 1985 under the three-year statute of limitations, and rejecting plaintiff's argument that the statute of limitations period did not begin to run until a later date when plaintiffs allegedly became aware of the defendants' discriminatory motive).

It makes no difference that some of the allegations of wrongdoing in the complaint describe statements or conversations that occurred in 2013 and as late as 2015 (*i.e.*, the alleged comments made to her by a city attorney and a client that she was on a "no pay" list and the alleged false statement by another city attorney that she had been disciplined and suspended from the practice of law). These additional allegations are adduced as evidence of the defendants' unlawful intent and not the actual basis for plaintiff's discrimination claims, all of which involve the City's long-since-announced refusal to pay plaintiff for her legal representation of city

9

employees.[10] Moreover, for the reasons set forth in defendants' briefing, these allegations from 2013 and 2015 do not suffice of themselves to support plaintiff's claim of a civil conspiracy pursuant to 42 U.S.C. § 1985 that extended into the limitations period. *See* Doc. #41 at 36-37.

There is no basis to conclude that the conduct at issue here—involving a discrete and definitive decision announced by a formal letter to plaintiff—should be subject to any continuing-course-of-conduct exception to the running of the statute of limitations. *See, e.g.*, *Gonzalez v. Hasty*, 802 F.3d 212, 222 (2d Cir. 2015) ("the continuing violation doctrine does not apply to [plaintiff's] First and Fifth Amendment claims, which are based on discrete acts by the defendants, each of which would start the running of the statute of limitations for that act"); *cf. Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 157 (2d Cir. 2012) (applying Title VII anti-discrimination law; "an employer's failure to promote is by its very nature a discrete act," and "[d]iscrete acts of this sort, which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period"). If plaintiff were correct in her argument to the contrary, then the statute of limitations would be forever manipulable by plaintiff, because she could re-start the statute of limitations at any time by printing up and submitting a new invoice to the City for payment, regardless of her prior knowledge that the City would refuse to pay.

Plaintiff argues that her § 1981 claim should be subject to a 4-year statute of limitations rather than a 3-year statute of limitations. Doc. #49 at 5-7. In light of Congressional amendments

---

[10] As plaintiff states in her briefing, "[w]hat is alleged is that Plaintiff had existing contract relations with various clients," and that "[d]efendants sought to interfere with those already established contract relations *by refusing to comply with their statutory obligation to pay for the clients' defense*." Doc. #49 at 6 (emphasis added). But even if I were to construe the complaint at its fringes to allege tortious interference by one or more of the defendants with plaintiff's client relationships that are separate from the City's unwillingness to pay plaintiff to represent city employees (*i.e.*, that defendants sought to interfere with plaintiff's relationship with any clients who wished to sue the City, as distinct from clients who wished to be defended in lawsuits arising from their city employment), I would conclude for the reasons advanced later in this ruling that plaintiff has not alleged facts sufficient to plausibly establish that such tortious interference was due to any race-discriminatory reason.

to § 1981, it is true that a 4-year statute of limitations applies to certain kinds of § 1981 claims that challenge *post*-contract-formation conduct that had been previously determined by the U.S. Supreme Court not to be actionable under § 1981. *See* 28 U.S.C. § 1658(a); *see also Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004) (explaining application of § 1658(a) to § 1981 claims). But, as defendants argue, plaintiff's claim here turns on defendant's refusal to contract with her in the first instance, rather than on any post-contractual conduct. *See* Doc. #60 at 2-4. Accordingly, I conclude that the 3-year statute of limitations properly applies here.

But even if I were to accept plaintiff's attempt to characterize her § 1981 claim as a claim against defendants' post-contractual interference with the pre-existing contracts of representation that she had with city employees, I would conclude that her complaint falls short of alleging plausible grounds for relief on that theory. The City's letter to plaintiff on October 29, 2010, made clear that plaintiff was free to enter into a contract for representation with her clients for their personal purposes but that she should not purport to represent to a court or any other party that her representation of any client was pursuant to the City's statutory indemnification-for-legal-fees obligations.[11] Thus, plaintiff's complaint here is not that the City prevented her from contracting to represent clients at all but simply that the City would not pay for her to do so.

This distinction is fatal to plaintiff's claim, because it is not enough for a plaintiff seeking recovery under § 1981 to allege harm that relates in some collateral way from a breach of contract between other parties. As the Supreme Court has explained, "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, *so long as the plaintiff has or*

---

[11] The letter provides in relevant part: "While a city employee may desire to retain your legal services to protect their personal interests, and enter into an agreement in which they agree to represent you for your services, such an arrangement does not authorize you to represent to the Court, or to any other party, that you are representing such an employee pursuant to the City's obligation pursuant to C.G.S. Sec. 7-465 and/or 7-101a et seq." Doc. #41-2 at 1.

*would have rights under the existing or proposed contractual relationship.*" *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (emphasis added). "Absent the requirement that the plaintiff himself must have rights under the contractual relationship, § 1981 would become a strange remedial provision designed to fight racial animus in all of its noxious forms, but only if the animus and the hurt it produced were somehow connected to *somebody's* contract," and the Supreme Court has "never read the statute in this unbounded—or rather, *peculiarly* bounded—way." *Ibid.* (emphasis in original).

Although plaintiff had contractual rights with her clients, she had no *contractual* rights—direct or indirect—to any payments from the City. As Judge Bryant has otherwise concluded with respect to a similar discrimination claim pursued by the very same plaintiff, the Connecticut statutory indemnification requirement, "Conn. Gen. Stat. § 7-101a does not confer contractual rights on the [attorney] Plaintiff—who is not a municipal employee—such that she could satisfy the third element of her 42 U.S.C. § 1981 claim for discrimination in the making and enforcing of contracts." *Miller v. Bridgeport Bd. of Educ.*, 2013 WL 3936925, at *14 (D. Conn. 2013) (dismissing plaintiff's § 1981 claim).

Apart from the duty imposed under § 7-101a for the City to indemnify its employees, there is nothing in the language of § 7-101a to indicate that it gives rise to contractual rights in favor of the employee, much less any contractual rights (or any rights at all) in favor of an attorney who might seek money to represent the employee. "[A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe*

12

*Ry. Co.*, 470 U.S. 451, 465–66 (1985); *Cece v. Felix Indus., Inc.*, 248 Conn. 457, 465–66 (1999) (same).

In short, plaintiff's federal discrimination claims are all time-barred by the 3-year statute of limitations. To the extent that plaintiff contends that one of these claims—her claim under § 1981—is entitled to a longer, 4-year statute of limitations, this argument fails for lack of any showing that she had contractual rights to payment from the City that are subject to protection under § 1981.

### *Lack of Factual Allegations to Give Rise to Plausible Grounds for Relief*

Even if I were to conclude that plaintiff's federal law claims of discrimination were not time-barred, I would conclude that plaintiff has not otherwise alleged plausible grounds to conclude that her race had anything to do with the City's refusal to pay her to represent city employees pursuant to its statutory indemnification obligation under Conn. Gen. Stat. § 7-101a. The complaint, for example, does not identify any race-based comments or other facts suggesting that defendants have mistreated plaintiff on race-based grounds. Although plaintiff alleges that the City engages "only majority white law firms" to furnish services pursuant to § 7-101a and that the City has retained "no African-American lawyers similarly situated to Plaintiff to perform legal services pursuant to C.G.S. § 7-101a," Doc. #31 at 7-8 (¶¶ 45-46), the probative value of these allegations about the City's attorney-retention practices are severely undermined by the fact—as I have previously ruled—that the Office of the City Attorney employed at least one African-American attorney as one of its attorney staff members and employed at least one African-American attorney as outside counsel for purposes of representing city employees in accordance with the City's indemnification obligations under § 7-101a. *See Miller v. Bridgeport Bd. of Educ.,* 2014 WL 3738057, at *4-*5 (D. Conn. 2014) (granting Rule 11 sanctions against

plaintiff for falsely alleging that the Bridgeport Board of Educuation and Anastasi "engag[ed] only non-African-American attorneys and law firms to perform legal services" and that they "have no African-American attorneys who perform legal services for it pursuant to Conn. Gen. Stat. § 7-101a").[12]

The only remaining facts alleged to suggest that the City's adverse actions were motivated by plaintiff's race—as distinct from the non-race-based reasons stated by the defendants—was that in one instance the City arranged for the representation of a city employee (Valentin) by an attorney who was a white male, and that in another instance a city attorney recommended to one of plaintiff's clients that he retain an attorney who is a white male.[13] These facts alone do not give rise to plausible grounds to believe that a reason for adverse action by the defendants against plaintiff was because of plaintiff's race. It is not enough for a complaint to rely on naked allegations of racial discrimination absent the allegation of specific facts to create a plausible inference of racial animus or race-based bias *and* a plausible inference that any adverse actions were the result of such racial animus or race-based bias. *See, e.g.*, *Robledo v. Bond No. 9*, 965 F. Supp. 2d 470, 475 (S.D.N.Y. 2013).

As to plaintiff's allegations about false statements made by defendant Laske in March 2015 to her clients and in Laske's submission to the CHRO, there is no basis to conclude that a

---

[12] The cited lawsuit in *Miller v. Bridgeport Board of Education* involved highly similar claims of race discrimination by the same plaintiff arising from the City's refusal to pay for her representation of an employee who worked for the Bridgeport Board of Education (as distinct from the instant case which principally involves employees of the Bridgeport Police Department). After plaintiff declined an opportunity to withdraw or amend the statements that were alleged to be categorically false, I dismissed that lawsuit with prejudice after concluding that these allegations "were false—and that they were knowingly and strategically and objectively unreasonably so" for the purpose of allowing plaintiff to survive a prior motion to dismiss that was filed before Judge Bryant. *Miller*, 2014 WL 3738057, at *9. Although the allegations in the instant case about the City's attorney hiring/retention practices are more narrowly drawn than the false allegations in *Miller v. Bridgeport Board of Education*, my conclusion there holds equally true here: that plaintiff "must have understood that any inference of discrimination would be far less potent—or well-nigh non-existent at all—if she conceded (as she knew) that the defendants regularly engaged the services of at least two African–American attorneys." *Ibid*.

[13] The complaint alleges that the outside counsel appointed by the City to represent Valentin was a white male, Doc. #31 at 6 (¶ 35), but does not allege the race of attorney Thomas Bucci, *id.* at 9 (¶¶ 56-57). Nor as to client Karpus does the complaint alleges that the City tried to replace plaintiff with a white attorney.

reason for any such false statements was plaintiff's race. Nor is there even a basis to conclude that the statements were materially false with respect to the impact that any inaccuracy in the statements would have had on any of plaintiff's clients. Laske allegedly stated in part that plaintiff had been "referred to the Statewide Grievance Counsel for disciplinary action." Doc. #31 at 12 (¶ 79). That statement was doubly true. This Court itself had previously referred plaintiff for disciplinary action because of her knowingly false statements made in pleadings before this Court. *See Miller v. Bridgeport Bd. of Educ.*, 2014 WL 3738057, at *1 (D. Conn. 2014).[14] And the Connecticut Appellate Court had also referred plaintiff to the Chief Disciplinary Counsel on grounds of plaintiff's misconduct in litigation before the Connecticut Appellate Court. Doc. #41-5 at 3.

Laske allegedly further stated that plaintiff had been "suspended from the practice of law." Doc. #31 at 12 (¶ 79). Although it does not appear that plaintiff was suspended altogether from the practice of law, plaintiff had been ordered temporarily suspended in December 2014 from the practice of law before the Connecticut Appellate Court on account of what the Connecticut Appellate Court determined to be "a persistent pattern of irresponsibility in handling her professional obligations before this court," including "the filing of frivolous appeals and the failure to file, or to file in timely and appropriate fashion, all documents and materials necessary for the perfection and prosecution of appeals before this court." Doc. #41-5 at 1. The Connecticut Appellate Court further concluded that plaintiff's conduct "has threatened the vital interests of her own clients" and that plaintiff "has neither accepted personal responsibility for the aforesaid conduct nor offered this court any assurance that such conduct will not be repeated" in the future.

---

[14] After notice and a hearing pursuant to this referral at which plaintiff testified, a reviewing committee of the Statewide Grievance Committee "conclude[d] by clear and convincing evidence that [plaintiff] engaged in unethical conduct in violation of the Rules of Professional Conduct," in violation of multiple disciplinary rules. *See* Danbury Judicial District Grievance Complainant v. Josephine Smalls Miller, Grievance Complaint #14-0803 (Oct. 30, 2015), available at http://www.jud.ct.gov/SGC/Decisions/14-0803.pdf (last accessed May 31, 2016).

*Ibid.*; *see also Miller v. Appellate Court*, 320 Conn. 759, 2016 WL 1203747, at *7, *8 (2016) (affirming Appellate Court order of suspension and further faulting plaintiff for arguing a "patently frivolous" interpretation of the Rules of Professional Conduct and engaging in a "shocking . . . persistence in making . . . reckless allegations" about the underlying record in her arguments before the Connecticut Supreme Court). There is no basis to claim that Laske's alleged misstatements were materially untrue, much less that any misstatement was due to plaintiff's race.

Apart from the lack of factual allegations to suggest that defendants acted against her on the basis of her race, the complaint is saturated with allegations that significantly undercut plaintiff's own claim of race-based discrimination. The complaint and the documents it references make clear that the City's stated concern with plaintiff's representation of city employees was because of her simultaneous representation of other litigants in lawsuits against the City.[15] Thus, plaintiff might have to work closely with the City and its staff attorneys in connection with the defense of certain city employees from litigation that was brought against the City and these employees, while at the same time plaintiff was an adversary of the City in other litigation. As discussed at oral argument, it is evident and obvious that a municipality could have valid reasons not to want to share client information and litigation playbook strategy for the joint defense of actions against the municipality and its employees with an attorney who is also the municipality's adversary in in other cases. Plaintiff put herself in an untenable position that was ripe and rife with a likelihood of conflicting interests, and the City's stated concerns for declining to authorize her representation for indemnification purposes makes eminent sense (and as indeed confirmed by the conclusions of the grievance panel that faulted plaintiff for

---

[15] Indeed, the complaint itself references at least one such action that she filed against the City on client Valentin's behalf. Doc. #31 at 12-13 (¶ 82). *See also Valentin v. Bridgeport Police Dept.*, 2015 WL 1897398 (D. Conn. 2015) (granting summary judgment against Valentin).

16

intervening in city-related litigation and deemed plaintiff's conduct to be "illegal"). *See also Miller v. Bridgeport Bd. of Educ.*, 2014 WL 1117810, at *3 (Bryant, J.) (plaintiff "Miller's allegation that her inclusion on a 'no pay' list, for instance, includes no allegation whatsoever that she was placed on this list because she is African American; rather, Miller's own proposed amended pleading admits, by implication, that the reason she is on such a list is because she often represents clients suing the City of Bridgeport, which also indicates that Miller may have a conflict of interest with the City of Bridgeport").

A court may appropriately consider the adverse allegations of a plaintiff's own complaint to determine that a plaintiff has not alleged plausible grounds for relief. *See, e.g.*, *Fremantlemedia,* 613 Fed. Appx. at 69 (affirming dismissal of race discrimination claim where plaintiff "has not provided any facts that give rise to a plausible inference that he was disqualified due to his race" and where "the complaint provides a different, and entirely valid, reason for Golightly's disqualification" involving plaintiff's dishonesty in an application); *Kajoshaj v. New York City Dept. of Educ.*, 543 Fed. Appx. 11, 14 (2d Cir. 2013) (naked allegations of discrimination undercut by "plaintiffs' own allegation" of facts in complaint that provide a more plausible explanation for the Academy's decision not to promote [plaintiff] than animus based upon national origin and religion"). Here, it is clear that the complaint does not set forth facts that give rise to plausible grounds to conclude that any of the defendants acted against plaintiff because of her race.

## CONCLUSION

Defendants' motion to dismiss (Doc. #41) is GRANTED with prejudice as to the federal law claims (Counts One, Two, Six, and Seven). Plaintiff has already been given leave to amend her complaint twice, and any further amendment of the federal law claims would be futile.

Defendants' motion to dismiss is otherwise GRANTED without prejudice as to her state law claims (Counts Three, Four, and Five) over which the Court declines to exercise pendent or supplemental jurisdiction. The Clerk of Court is directed to close this case.

It is so ordered.

Dated at New Haven this 31st day of May 2016.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge
